B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Barbara Sennett, Hans Wagner, J. Doe | **DEFENDANTS**<br> Joseph P. Shaine |
|---|---|

| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Matthew M. Hamel, Esq. & Cynthia R. Ravosa, Esq.<br>Massachusetts Bankruptcy Center 1 South Ave. Natick, MA<br>01760 508-655-3013 | **ATTORNEYS** (If Known)<br>Carl D. Aframe, Esq. |
|---|---|

| **PARTY** (Check One Box Only)<br>□ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor        □ Other<br>□ Trustee | **PARTY** (Check One Box Only)<br>☑ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor        □ Other<br>□ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Plaintiffs seek to have their claim excepted from discharge and to obtain stay relief
11 U.S.C. §§ 523(a)(6); 1328(a)(4); 523(a)(2)(A); 362(d)(1); and 1301

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- □ 11-Recovery of money/property - §542 turnover of property
- □ 12-Recovery of money/property - §547 preference
- □ 13-Recovery of money/property - §548 fraudulent transfer
- □ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- □ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- □ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- □ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- □ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- □ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☒3 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- □ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- □ 61-Dischargeability - §523(a)(5), domestic support
- ☒1 68-Dischargeability - §523(a)(6), willful and malicious injury
- □ 63-Dischargeability - §523(a)(8), student loan
- □ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☒2 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- □ 71-Injunctive relief – imposition of stay
- □ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- □ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- □ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- □ 01-Determination of removed claim or cause

**Other**
- □ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☒4 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

Relief from stay and co-debtor stay

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Joseph P. Shaine | BANKRUPTCY CASE NO.<br>23-40650-EDK | |
| DISTRICT IN WHICH CASE IS PENDING<br>Massachusetts | DIVISION OFFICE<br>Worcester | NAME OF JUDGE<br>Hon. Elizabeth D. Katz |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Matthew M. Hamel | | |
| DATE<br>11/28/2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Matthew M. Hamel, Esq. | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re: ) | CHAPTER 13 |
| ) | CASE NO. 23-40650-EDK |
| JOSEPH P. SHAINE, ) | |
| ) | |
| Debtor ) | |
| ) | |
| ) | |
| BARBARA SENNETT, ) | |
| HANS WAGNER, AND ) | |
| J. DOE, *a minor child*, ) | |
| ) | |
| Plaintiffs ) | |
| ) | |
| v. ) | |
| JOSEPH P. SHAINE, ) | ADV. PROCEEDING NO. |
| ) | |
| Defendant ) | |
| ) | |

### **COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT**

Pursuant to 11 U.S.C. § 523(a)(6), 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 1328(a)(4), 11

U.S.C. § 362, and 11 U.S.C. § 1301, and Fed. R. Bankr. P. 7001(6), Creditors Barbara Sennett, Hans

Wagner, and J. Doe,[1] (hereinafter, "Plaintiffs") by and through their undersigned Counsel, seek an

Order determining that the Plaintiffs' Claim against the Debtor is non-dischargeable based on any and

all statutory predicates listed above. Additionally, the Plaintiffs seek relief from the automatic stay

and co-debtor stay to allow them to obtain judgment and a damages award in the Middlesex Superior

Court where it is currently pending, though stayed by the bankruptcy proceedings.

### **JURISDICTION AND VENUE**

1. On August 9, 2023, ("the Petition Date"), the Defendant filed a voluntary petition in the

   United States Bankruptcy Court for the District of Massachusetts under Chapter 13 of the

---

[1] J. Doe is a pseudonym. J. Doe is a minor child whose name is therefore redacted pursuant to Fed. R. Bankr. P. 9037.

Bankruptcy Code (11 U.S.C. §§ *et seq.*, the "Bankruptcy Code") Case No. 23-40650 ("the Lead Bankruptcy").

2. The Court, therefore, has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding. An Adversary Proceeding is required by Fed. R. Bankr. P. 7001(6) and the Court has jurisdiction to enter a final judgment.

3. To the extent the Court determines that it lacks jurisdiction to enter a final judgment on any issue(s) raised in this Complaint, the Plaintiffs assent to the Court's entry of a final judgment on any such issue(s).

4. Venue of this action is appropriate based on the underlying bankruptcy case.

## PARTIES

5. Plaintiff Barbara Sennett (individually, "Sennett") is a natural person, a dual citizen of the United States of America and the French Republic, currently residing in Maisons-Laffitte, France.

6. Plaintiff Hans Wagner (individually, "Wagner") is a natural person, a dual citizen of the United States of America and the French Republic, currently residing in Maisons-Laffitte, France.

7. Plaintiff J. Doe is a natural person, the minor child of Plaintiffs Sennett and Wagner (collectively, "Plaintiff Parents"), a dual citizen of the United States of America and the French Republic, whose legal residence is that of their[2] parents in Maisons-Laffitte, France.

8. Defendant Joseph P. Shaine ("Defendant" or "Shaine") is a natural person who maintains his principal residence at 7 North End Road, Townsend, Massachusetts. Defendant Shaine is the Debtor in the lead bankruptcy case. Defendant Shaine is believed to be approximately sixty-five (65) years old.

---

[2] In order to fully shield J. Doe's identity, the gender-neutral pronoun "their" will be used throughout.

## NATURE OF THE ACTION

9.  This proceeding seeks an Order (1) declaring that the Plaintiffs' claim against the Defendant is excepted from Discharge, and (2) granting the Plaintiffs relief from the automatic stay and co-debtor stay to continue their ongoing litigation against the Defendant in state court, in addition to seeking costs, and legal fees.

## FACTS

9.  Plaintiffs Sennett and Wagner have two children, an older, unnamed child[3] ("Older Child"), and the Plaintiff J. Doe, who began taking courses with the Defendant at the age of thirteen (13).

10. In 2014, when Older Child was eleven (11) years old, they were diagnosed with an autoimmune thyroid disease, and from then on struggled with chronically unstable health and often serious medical complications, sometimes requiring hospitalization, along with serious mental health challenges.

11. Plaintiff J. Doe had serious mental health crises in 2020-2021.

12. On or about May 5, 2023, the Creditor commenced a civil action against the Debtor, and other non-filing co-defendants, in the Superior Court of Middlesex County, Massachusetts.

13. The operative complaint is attached as an exhibit hereto and incorporated herein by reference.

14. What follows is a summation of the relevant events described in the civil complaint.

15. As alleged in the civil complaint, the Defendant operated an online education platform (variously named "Gifted Conference Planners" ("GCP") and "Gifted Homeschoolers Program" ("GHF")) for homeschooling children, at which J. Doe and Older Child were enrolled, from 2019 through 2021.

---

[3] The older child is not a party to this matter. The older child's name is not being used herein because much of the events that gave rise to the civil action occurred while the older child was a minor. The pronoun "they" is used as a singular pronoun to describe Older Child is used to further protect their identity.

16. The Defendant held himself out as a teacher and tutor at GHF and GCP, and as president of GCP.

17. Plaintiff Parents enrolled themselves, and Older Child in a GHF course through GCP which was taught by the Defendant.

18. All expenses associated with Older Child's and J. Doe's enrollment at GCP/GHF, including but not limited to tuition, was paid for by the Plaintiff Parents.

19. In or around 2020 (Spring term 2020), the Defendant, upon information and belief, caused all GCP's course offerings to be taught and run by GCP as GCP's own courses, some of which were taught by the Defendant.

20. An employee of the Defendant, one Lisa Fontaine-Rainen, who is not a party to this matter but is a defendant in the state court action, is also held out as a teacher by GCP.

21. According to the publicly available licensure database[4] maintained by the Commonwealth of Massachusetts, neither the Defendant nor Fontaine-Rainen are licensed teachers in the Commonwealth of Massachusetts.

22. Despite lacking a teaching license, the Defendant and Fontaine-Rainen, at all times relevant hereto, held themselves out as teachers in the Commonwealth of Massachusetts and taught courses through an educational program based in the Commonwealth of Massachusetts.

23. The Plaintiff Parents believed that the courses offered by GCP/GHF would be high quality courses, taught by licensed professionals.

24. Plaintiff Parents believed that Older Child was receiving instruction in subjects such as mathematics, philosophy, psychology, social science, history, and literature.

25. However, during this time, the Defendant and Fontaine-Rainen, beginning when Older Child was sixteen years old, cultivated a grooming relationship with Older Child through incessant

---

[4] https://www.doe.mass.edu/licensure/lookup/

communications (at all hours of the day/night, regardless of the time difference between the United States and France), and through various communication channels, including those not used by the educational program.

26. The Defendant and Fontaine-Rainen convinced Older Child that Older Child suffered abuse at the hands of Plaintiff Parents. This supposed "abuse" was nothing of the sort and was a complete fabrication of the Defendant and his employee which they manipulated Older Child to believe was real.

27. The Defendant and Fontaine-Rainen ultimately convinced Older Child to abscond from the family home, *in France*, amidst treatment for multiple, serious medical conditions (of which the Defendant and Fontaine-Rainen were aware) and traveled to the Debtor's residence in Massachusetts at the behest of the Defendant.

28. The Plaintiffs Sennett and Wagner had no advanced knowledge of this trip, which was planned between the Debtor and Older Child in surreptitious communications over various platforms. Plaintiffs Sennett and Wagner, upon discovering that their seriously ill child was missing, amidst the COVID-19 pandemic, were worried beyond measure.

29. Several weeks later, in April, 2021, the Plaintiff Parents contacted the Federal Bureau of Investigation (FBI), which ultimately confirmed that Older Child arrived in Boston on Air France flight 334 from Paris.

30. Indeed, the Defendant and his employee, Fontaine-Rainen, actively concealed Older Child's whereabouts from the Plaintiff Parents, and did not tell Plaintiff Parents that their child, barely eighteen years old, was now *living with the Defendant*, *a sixty-five-year-old man*.

31. The Defendant and Fontaine-Rainen, began a similar grooming relationship with Plaintiff J. Doe, when they began taking courses with GCP/GHF in 2020.

32. The grooming of Plaintiff J. Doe followed a similar pattern as that experienced by Older Child, including incessant communication during non-instruction time, across various communication platforms, regarding topics unrelated to the course instruction, and completely inappropriate to be discussed in a teacher/student relationship (between two adults and a *thirteen-year-old child*).

33. The extra-curricular discussions included topics such as: (1) Plaintiff J. Doe's mental health, including the Defendant issuing a "diagnosis"[5] that J. Doe suffers from Dissociative Identity Disorder (DID),[6] and discussions of J. Doe's suicidal ideations; (2) similar attempts to implant memories of abuse allegedly suffered by J. Doe at the hands of Plaintiff Parents (all fabricated); (3) J. Doe's sexuality, including opining from Fontaine-Rainen that J. Doe should "explore their sexuality;" and (4) statements of love and affection by the Defendant and Fontaine-Rainen to J. Doe, including, but not limited to, describing J. Doe as "sweet child o' mine" (Defendant) and "kitten" (Fontaine-Rainen).

34. These conversations were all concealed from the Plaintiff Parents at the behest of the Defendant and Fontaine-Rainen, including Plaintiff J. Doe's disclosures of suicidal ideation.

35. The Defendant further discussed with Plaintiff J. Doe a plan to secretly record conversations between J. Doe and the Plaintiff Parents. J. Doe obliged and recorded conversations with the Plaintiff Parents, and including at least two family therapy sessions, held on February 6, 2021 and February 19, 2021. The Plaintiff Parents did not consent to the creation of these recordings.

---

[5] Upon information and belief, the Defendant is neither a licensed psychologist nor a psychiatrist and is therefore not competent to issue such a diagnosis.
[6] Previously known as "Multiple Personality Disorder." *See* https://www.mayoclinic.org/diseases-conditions/dissociative-disorders/symptoms-causes/syc-20355215

36. The Defendant and Fontaine-Rainen used these recordings to attempt to convince Plaintiff J. Doe that they had been abused by the Plaintiff Parents.

37. On or about June 15, 2021, Plaintiff J. Doe learned that Defendant Shaine had repeatedly attempted to touch Older Child in an inappropriate and sexual manner at the Defendant's Townsend, Massachusetts residence.

38. Plaintiff J. Doe was shocked by the disclosure and confronted the Defendant about it, at which time the Defendant admitted that he should not have done what he did. Plaintiff J. Doe ceased communications with the Defendant (but not with Fontaine-Rainen) thereafter.

39. These events have taken an unimaginable toll on the Plaintiffs, physically and psychologically.

40. Plaintiff Parents have been deprived of a relationship with Older Child, and Plaintiff J. Doe his been deprived of a relationship with their sibling, because of the Defendant's grooming and emotional manipulation of Older Child.

41. Plaintiff Parents' relationship with Plaintiff J. Doe was severely harmed by the Defendant's grooming and emotional manipulation of Plaintiff J. Doe.

42. The civil case is presently pending in Middlesex County Superior Court as Case No. 2381CV01291.

43. On August 8, 2023, the Superior Court issued an Order of Default in favor of the Plaintiffs and against the Defendant in the civil action. The civil action was stayed by 11 U.S.C. §§ 362 and 1301 on September 9, 2023.

## COUNT I
## DETERMINATION OF NON-DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(6)

44. The Plaintiffs, Barbara Sennett, Hans Wagner, and J. Doe, repeat and reaver paragraphs one through thirty-nine of this Complaint as if expressly rewritten and set forth herein.

45. The Plaintiffs alleged severe harm, willfully and knowingly caused by the Defendant, through the grooming of J. Doe and Older Child, by the Defendant and his employee, Fontaine-Rainen.

46. The Defendant and his employee, Fontaine-Rainen, manipulated the older child to not only leave their parents' home, but to leave the country in which they resided, despite their need for ongoing medical care, leaving their family in emotional shambles, as further described in the civil complaint.

47. The Defendant and his employee, Fontaine-Rainen, further directly groomed and abused Plaintiff J. Doe, taking advantage of their positions as a teacher of Plaintiff J. Doe, a relationship which began when the Plaintiff J. Doe was only thirteen years old, and abused that position to manipulate and mistreat J. Doe to J. Doe's detriment.

48. Any debts owed by the Defendant to the Plaintiffs on account of the events described herein and in the civil complaint, are exempt from discharge pursuant to 11 U.S.C. § 523(a)(6), due to the Defendant's and his employee's knowing, willful, injurious, and tortious conduct.

WHEREFORE, the Plaintiffs demand a judgment and decree excepting the Plaintiffs' claim from discharge in the lead bankruptcy, and awarding the Plaintiffs costs, and reasonable attorney's fees.

## COUNT II
## DETERMINATION OF NON-DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 1328(a)(4)

49. The Plaintiffs, Barbara Sennett, Hans Wagner, and J. Doe, repeat and reaver paragraphs one through forty-four of this Complaint as if expressly rewritten and set forth herein.

50. For the reasons asserted herein, the Defendant has caused the Plaintiffs damages, for which they have held him civilly liable in the Middlesex Superior Court.

51. An order of default has entered and all that remains to be determined is an award of damages.

52. Any damages awarded in that matter are exempt from discharge pursuant to 11 U.S.C. §

1328(a)(4), due to the Defendant's and his employee's knowing, willful, injurious, and tortious

conduct.

WHEREFORE, the Plaintiffs demand a judgment and decree excepting the Plaintiffs' claim from

discharge in the lead bankruptcy, and awarding the Plaintiffs costs, and reasonable attorney's fees.

### COUNT III
### DETERMINATION OF NON-DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(2)(A)

53. The Plaintiffs repeat and reaver paragraphs one through forty-eight of this Complaint as if

expressly rewritten and set forth herein.

54. At all times material hereto, the Defendant held himself and his employee, Fontaine-Rainen, out

as teachers, despite knowing that neither he nor Fontaine-Rainen, were licensed as such.

55. The Defendant materially misrepresented his own professional standing as well as that of his

employee which induced the Plaintiff Parents into entering into contracts with the Defendant for

the education of their children.

56. Had the Plaintiff Parents known that the Defendant and his staff were not licensed teachers,

Plaintiff Parents would not have engaged their services.

57. Had the Plaintiff Parents known that the Defendant and his employee would pursue grossly

inappropriate personal relationships with their children outside of the teacher/student relationship,

Plaintiff Parents would not have engaged Defendant's services.

58. Furthermore, the Defendant fraudulently concealed the nature of his relationship with Older Child

and J. Doe, including, but not limited to: (1) the Defendant's fraudulent misrepresentations that he

did not know the whereabouts of Older Child after their flight from France (despite Older Child

living with the Defendant), causing severe shock and stress to the Plaintiffs, manifesting in

9

objective symptomology as discussed in the civil complaint; and (2) withholding J. Doe's

statements of suicidal ideation from the Plaintiff Parents despite the Defendant's knowledge of J.

Doe's mental health struggles, which allowed J. Doe's mental health to decline.

59. Defendant's entire relationship with the Plaintiffs was fraudulent and predatory.

WHEREFORE, the Plaintiffs demand a judgment and decree excepting the Plaintiffs' claim from

discharge in the lead bankruptcy, and awarding the Plaintiff costs, and reasonable attorney's fees.

### COUNT IV
### RELIEF FROM AUTOMATIC STAY AND CO-DEBTOR STAY PURSUANT TO 11 U.S.C. §§ 362(d)(1) and 1301

60. An order of default in the Middlesex Superior Court entered against the Defendant on August 8,

2023.

61. All that remains to be litigated in Superior Court is the award of damages.

62. This court should grant relief from the automatic stay and co-debtor stays for cause to allow the

Superior Court matter to proceed to an award of damages in order to allow for the Plaintiffs'

claim to be liquidated and reduced to a sum certain.

WHEREFORE, the Plaintiff respectfully prays that this Honorable Court enter an Order:

1. Declaring that the Creditors/Plaintiffs' claim is excepted from Discharge;

2. Granting relief from the automatic stay and co-debtor stay;

3. Awarding the Plaintiffs costs;

4. Awarding the Plaintiffs reasonable attorney fees; and

5. Granting any other relief, which this Court may deem necessary and proper pursuant to 11

U.S.C. § 105.

> Respectfully submitted,
>
> The Creditors,
> Barbara Sennett,

Hans Wagner, and
J. Doe

By their attorneys,

/s/ Matthew M. Hamel
Matthew M. Hamel, Esquire
BBO No. 697773
Cynthia R. Ravosa, Esquire
BBO No. 696996
Massachusetts Bankruptcy Center
One South Avenue
Natick, MA 01760
(508)-655-3013
(617) 720-1104 (fax)
Dated: November 28, 2023        massachusettsbankruptcycenter@gmail.com

<u>**EXHIBIT 1**</u>

COMMONWEALTH OF MASSACHUSSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT OF
THE COMMONWEALTH

BARBARA SENNETT,
HANS WAGNER & J. DOE
Plaintiffs,

v.

JOSH SHAINE, aka
JOSEPH P. SHAINE,
LISA FONTAINE-
RAINEN & GIFTED
CONFERENCE
PLANNERS
Defendants

Civil Action No: 23-1291

FILED
IN THE OFFICE OF THE
CLERK OF COURTS

MAY 0 5 2023

FOR MIDDLESEX COUNTY
CLERK

## COMPLAINT AND JURY DEMAND

This Complaint reflects the unlawful conduct of the Defendants relating to their purposeful and tortious conduct, insinuating themselves into the family privacy of the Plaintiffs and damaging the Plaintiffs' family relationships. The Defendants' conduct invaded upon the family's right of privacy and ability to maintain their private affairs and maliciously manipulated adult Plaintiffs and their young, vulnerable children, one of whom also is a Plaintiff herein. The Defendants' activity was in no way reasonable, and it was not privileged; the Defendants' conduct was serious, substantial, extreme and outrageous and beyond the bounds of civilized decency. The Defendants' conduct seriously injured and extremely distressed the Plaintiffs and the Plaintiffs now seek damages.

## PARTIES

1. The Plaintiff Barbara Sennett ("Sennett") is an adult individual and a dual citizen of the United States and France; this plaintiff currently resides in Maisons-Laffitte, France.

2. The Plaintiff Hans Wagner ("Wagner") is an adult individual and a dual citizen of the United States and France; this plaintiff currently resides in Maisons-Laffitte, France.

3. The Plaintiff J. Doe ("J. Doe")[1] is a child whose legal residence is designated as the home of their parents, Plaintiffs Barbara Sennett and Hans Wagner, in Maisons-Laffitte, France; J. Doe is dual citizen of the United States and France.

4. The Defendant, Josh Shaine ("Shaine"), is an adult individual with a residential address in Townsend, Middlesex County, Massachusetts. Shaine was born in 1956 and is over sixty-five (65) years old.

   a. At all times material hereto, Shaine acted as the President of and a teacher for Gifted Conference Planners.

5. The Defendant Lisa Fontaine-Rainen ("Fontaine-Rainen") is an adult individual and United States citizen who, at the time relevant to this complaint, resided in Cape Town, South Africa. Fontaine-Rainen was born in 1978 and is over forty (40) years old. Fontaine-Rainen has had continuous and systematic contact with Massachusetts since at least 2019, providing teaching services through the Massachusetts-based organization relevant to these claims, Gifted Conference Planners, and conducting banking services through Massachusetts.

   a. At all times material hereto, Fontaine-Rainen was an instructor for Gifted Conference Planners.

6. The Defendant Gifted Conference Planners ("GCP")[2] maintains a commercial website and

---

[1]     This Complaint uses the personal pronoun "they" to reference J. Doe in the singular.

[2]     GCP is not registered as a corporation with the Commonwealth of Massachusetts Secretary of State, nor does it appear to be registered with any state in the union. GCP also does not appear to be registered as a charity with the Massachusetts Attorney General's Office. Additionally, a review of the Internal Revenue Service website for GCP resulted in no records being found.

holds itself out as a non-profit corporation established to run conferences and provide

teaching both privately and in classes for "gifted young people." The GCP website devotes

pages to, *inter alia,* course lists and schedules, course descriptions, brief biographical

statements, and the opportunity to set up customer accounts and purchase its services.

    a. Defendant GCP appears to have its principal place of business in the home of

       Defendant Shaine in Townsend, Massachusetts.[3]

    b. Townsend Massachusetts Town Clerk holds a current DBA (Doing Business As)

       Certificate in the name of: Joseph Shaine DBA Gifted Conference Planners, with

       the time frame of February 18, 2020 to February 18, 2024.

7. Defendant GCP may be an entity in its own right or an alter ego, DBA, and/or self-

employed business name for Defendant Shaine.

### JURISDICTION AND VENUE

8. The Middlesex Superior Court has jurisdiction over this matter, where this is a civil action

for money damages in excess of $50,000, which is within the jurisdiction of the Superior

Court.

9. Jurisdiction and venue are proper in Middlesex County because it is the judicial district in

which Defendant Shaine resides and thus a substantial part of the events giving rise to this

action occurred in this County.

10. Jurisdiction and venue are proper in Middlesex County because Fontaine-Rainen has had

continuous and systematic contact with Massachusetts from 2019 through present by

transacting business and contracting to supply services with GCP, which is located in

---

[3]    The "Donate" page of the Gifted Conference Planners website lists Shaine's residential
address as the location to where checks may be sent.
https://www.giftedconferenceplanners.org/page-1027372

Middlesex County; where Fontaine-Rainen has supplied services to Middlesex-based GCP, and received payment for the same, jurisdiction and venue in Middlesex County are proper.

11. Jurisdiction and venue are proper in Middlesex County because it is the judicial district in which Defendant GCP has designated as its principal place of business.

12. Jurisdiction and venue are proper in Middlesex County because the Plaintiffs are willing to avail themselves to this forum.

## STATEMENT OF FACTS

13. The Plaintiffs Sennett and Wagner (together, as "Plaintiff Parents") are American citizens who have been living overseas since the late 1990s.

14. Plaintiff Parents have two children, including Plaintiff J. Doe, both children were born in France and acquired US citizenship at birth.

15. All Plaintiffs have dual US and French citizenship.

16. Plaintiff Parent's older child was born in December 2002 (hereinafter, "Older Child[4]")[5].

17. Plaintiff's younger child, Plaintiff J. Doe, was born in March 2007.

18. Plaintiff's family home has been in France since 2019.

19. Plaintiff Parents were Older Child's physical and legal guardians and caregivers throughout their life.

20. Plaintiff Parents have been and remain J. Doe's physical and legal guardians and caregivers.

21. Older Child was homeschooled from 2012 until 2021.

---

[4]      This Complaint, and any and all future filings, will utilize "Older Child" in place of the legal name for this individual. This is done in the interest of privacy and because the activity in this complaint happened when they were a juvenile.

[5]      This Complaint uses the personal pronoun "they" to reference Older Child in the singular.

22. At the age of 11, in 2014, Older Child was diagnosed with an autoimmune thyroid disease, and from then on struggled with chronically unstable health and often serious medical complications.

23. Older Child also faced serious mental health challenges.

24. Plaintiff J. Doe was homeschooled 2016-2021.

25. Plaintiff J. Doe had serious mental health crises in 2020-2021.

26. GCP markets its services as providing a variety of classes, tutoring opportunities, and online "social" activities for gifted young people on its website.

27. In or around late 2018 GCP began offering, and subsequently hosting on its platform, courses of another online education program for gifted homeschoolers run by a non-profit organization, Gifted Homeschoolers Forum ("GHF") when the latter suffered financial and organizational collapse.

28. Defendant Shaine was previously listed as teacher and tutor at GHF.

29. Upon information and belief, Shaine took over reorganizing and temporarily running GHF in December 2018, shifted hosting GHF Spring term course registrations to GCP servers and made efforts at supporting and continuing GHF to at least the end of 2019.

30. Starting from when Shaine stepped in, GHF's 2019 courses were marketed, billed, and delivered through GCP's website and platforms.

31. In or around fall of 2019, GHF's board discontinued their online education courses and GCP began offering the same and similar online classes as their own, including featuring several teachers who previously taught for GHF.

32. From January 2020 (Spring term 2020) through at least May 2021 (Spring term 2021), GCP was running all classes as their own.

5

33. According to its website[6], GCP has continued offering online courses, conferences and tutoring to present.

34. Classes and tutoring through GCP are offered via video platforms.

35. GCP's website states "Josh Shaine is the president of Gifted Conference Planners and leads the Beyond IQ Conferences."

36. In addition to being GCP President, Shaine is listed as a "teacher" on the GCP website under "Teacher Bios" and under "Current GCP Course Offerings."

37. Shaine has taught online classes through GCP since at least 2019.

38. According to the Massachusetts Department of Elementary and Secondary Education Educator Licensure look up[7], Shaine does not have an educator license in Massachusetts.

39. GCP's website advertises its "Beyond IQ" Conference for 2021, 2022, 2023 as held at the Boxboro [Massachusetts] Regency Hotel and Conference Center and the 2024 conference to be held at the Chelmsford [Massachusetts] Radisson.

40. Fontaine-Rainen taught online classes via GHF and continued to offer the same or similar classes under GCP.

41. Fontaine-Rainen has taught under GCP since at least 2019 and continues to be listed under "Teacher Bios" on GCP's website.

42. On the date on which this document is dated, Fontaine-Rainen is listed as the Director of Live Online Courses at Hollingworth Institute, according to its website.[8]

43. The Hollingworth Institute has a physical location at 96 Dexter Street, Malden, Massachusetts.

---

[6]      https://www.giftedconferenceplanners.org/
[7]      https://www.doe.mass.edu/licensure/lookup
[8]      https://hollingworth.org/

44. On GCP's website, Fontaine-Rainen is listed in the course offerings from fall 2019 to
   spring 2021 "Course Offerings" and as a 2021 "Speaker" at the Boston Beyond IQ
   Conference.

45. According to the Massachusetts Department of Elementary and Secondary Education
   Educator Licensure look up, Fontaine-Rainen does not have an educator license in
   Massachusetts.

46. In spring semester of 2019, Plaintiff Parents enrolled Older Child and themselves in a GHF
   class through GCP which was taught by Shaine.

47. Shaine offered a second section of the course solely for Plaintiff family, due to their living
   in China at the time and having a 12-hour time difference.

48. Older Child had turned sixteen (16) years old just a few weeks before this course started.

49. Later in 2019, then sixteen-year-old Older Child took other GHF/GCP classes (two of
   which were with Shaine), then in 2020 continued to take GCP classes with Shaine, and
   subsequently with Fontaine-Rainen, until at least early spring term 2021.

50. The GCP classes Older Child took were purchased and paid for by Plaintiff Parents.

51. Plaintiff Parents purchased over fifteen GCP classes for Older Child over several terms
   spanning January 2019 through May 2021.

52. The GCP class enrollment fees were between $110 and $310, depending on the class.

53. Plaintiff Parents purchased these classes in good faith, believing that the courses would be
   serious, high quality, challenging courses, consistent with their experience with GHF and
   other online course providers.

54. Plaintiff Parents believed that Older Child was being educated in mathematics, philosophy,
   psychology, social science, history, and literature.

55.  On information and belief, soon after Older Child began taking GCP courses, in or around
February of 2019, Shaine began to have very frequent communications with Older Child and
these conversations quickly moved to personal matters, outside of coursework.

56. In December 2019, while Plaintiffs and Older Child were visiting family in Massachusetts
for a week, Shaine met Plaintiffs and Older Child in person and Shaine and Older Child had
two additional in-person meetings during that time.

57.  Older Child's first GCP class with Fontaine-Rainen was fall term 2020, which commenced
in August 2020.

58. On information and belief, around that time Older Child also began to have frequent
communications with Fontaine-Rainen and the two very quickly moved to discussing
personal matters outside of coursework.

59.  The communications between Shaine, Fontaine-Rainen and Older Child took place in
several forms and over various forums:  emails, Zoom meetings, phone calls and text
messages, as well as chat and video functions on the social media platform Discord.[9]

60.  During the time period from 2019 to 2021 when Older Child was continuing to take GCP
courses, Plaintiff Parents were not aware of the pervasive and highly personal
communications with Shaine and Fontaine-Rainen.

61. At no time did either Shaine or Fontaine-Rainen indicate to Plaintiff Parents that Shaine and
Fontaine-Rainen were having a personal relationship with Older Child beyond a teacher-

---

[9]      According to its website, *"Discord is a voice, video and text communication service
used by over a hundred million people to hang out and talk with their friends and communities.
Discord servers are organized into topic-based channels where you can collaborate, share, and
just talk about your day without clogging up a group chat."* See https://discord.com/   One can
chat/text with a direct message function (one to one) or set up a server "chatroom" where
multiple users can enter and exchange text messages. Both functions allow the exchange of
messages in real-time over a varied timeframe.

student relationship.

62. Shaine and Fontaine-Rainen were well aware that Older Child was physically compromised and emotionally vulnerable.

63. Upon information and belief, during communications with Older Child, from 2019 to at least 2021, Shaine and Fontaine-Rainen expressed negative and false information about Plaintiff Parents to Older Child.

64. During the time frame of these secret communications with Shaine and Fontaine-Rainen, Older Child became distant, confused, isolated, angry and hostile towards Plaintiff Parents.

65. During the time frame of these secret communications with Shaine and Fontaine-Rainen, Older Child became convinced that they had been abused by their parents, and that their parents were bad parents and bad people.

66. Upon information and belief, Shaine and Fontaine-Rainen convinced Older Child they had repressed emotional abuse by their parents, and Older Child needed to explore this underlying abuse.

67. Shaine and Fontaine-Rainen convinced Older Child that Plaintiff Parents only took care of Older Child because it was their obligation to do so and not because they loved Older Child.

68. The information Shaine and Fontaine-Rainen were providing to Older Child about Plaintiff Parents was not true and Shaine's and Fontaine-Rainen's ongoing secret communications amounted to indoctrinating Older Child to believe a false and twisted narrative that Plaintiff Parents were abusive and harmful.

69. Shaine and Fontaine-Rainen persuaded Older Child the only way they could be free of abuse was to run away from home.

70. Over a period of several months, from possibly as early as spring 2020 to February 2021,

Shaine's and Fontaine-Rainen's communications with Older Child included plotting and developing a plan for how Older Child would leave the family home.

71. Older Child had no financial resources, credit card, job, or independent source of income in 2020 and early 2021.

72. Older Child turned eighteen years old during December 2020.

73. The secret communications and grooming of Older Child by Defendant Shaine occurred when Older Child was sixteen, seventeen and early into the year after they turned eighteen years old.

74. Shaine and Fontaine-Rainen supplanted themselves in the place of Plaintiff Parents as trusted adults to Older Child, and while Older Child was still a minor, enticed, plotted, and secretly planned for Older Child to leave home.

75. Shaine and Fontaine-Rainen were well aware of Older Child's age and birthdate.

76. In fact, the Older Child's age and date for turning eighteen years old was part of the calculus of Defendants' plotting.

77. Shaine and Fontaine-Rainen purposefully planned with Older Child for their departure from the home for after Older Child turned eighteen, so Older Child would be able to travel by themselves legally.

78. Shaine and Fontaine-Rainen constructed logistics for Older Child to run away from home in France, and fly to Boston, Massachusetts, to reside with Shaine.

79. Shaine purchased the airplane ticket from France to Boston for Older Child.

80. Shaine and Fontaine-Rainen made specific and detailed plans with Older Child regarding leaving the family home and planning for departure, as well as how to hide the plan and details from Plaintiff Parents.

81. Older Child was hospitalized with a thyroid and heart rate spike from on or around September 30, 2020 to October 5, 2020, and again with an unrelated kidney infection from January 31, 2021 until February 5, 2021.

82. As of February 2021, Older Child's thyroid was not yet under control, so Older Child was undergoing treatment and interventions which included medication, endocrine and adrenal supports, hormone testing and treatments, and weekly blood tests and medical supervision.

83. Although their medical condition was tenuous, Older Child ran away from the family home in France on February 17, 2021, just two months after their eighteenth birthday, and flew to Boston, Massachusetts.

84. Relevant to the secret planning of the Older Child's departure, in February 2021, France had a home confinement order in place due to the COVID-19 pandemic.

85. Relevant to the secret planning of the Older Child's departure, in February 2021, also due to the COVID-19 pandemic, France's borders effectively were closed and only travel deemed essential was allowed.

86. Shaine retrieved Older Child from Logan Airport on February 17, 2021, and brought them to Shaine's home in Townsend, Massachusetts, and proceeded to have Older Child live with him.

87. When Plaintiff Parents discovered their medically compromised Older Child had run away from home, they were extremely upset, frantic, and distraught to the point they were physically ill and could not sleep or eat.

88. Plaintiff Parents checked their house and found that Older Child's passport and important identification materials, including Social Security card, were missing.

89. Plaintiff Parents quickly determined that it was likely Older Child went to the USA, as there

was no other country which would accept them to enter due to COVID travel restrictions.

90. Plaintiff Parents checked their bank account and credit cards and did not see any unusual transactions and there were no transportation transactions.

91. Plaintiff Parents began contacting all the known contacts of Older Child, including, but not limited to, both Shaine and Fontaine-Rainen.

92. Shaine confirmed to Plaintiff Parents on the evening of February 17, 2021 (i.e., the next day in France) that he was in communication with Older Child and that Older Child was tired but "fine".

93. Shaine did not tell Plaintiff Parents Older Child was with him in his home and implied they were not.

94. Plaintiff Parents determined Older Child must have taken an Air France flight to Boston.

95. Plaintiff Parents contacted Air France but were not able to obtain passenger information.

96. Plaintiff Parents contacted American Citizen Services at the US Consulate in Paris, which was unable to help because Older Child was eighteen and had the legal right to travel.

97. In April 2021, Plaintiff Parents made contact with the FBI, who confirmed that Older Child entered the United States at the Port of Logan Airport on February 17, 2021, on Air France flight 334 from Paris.

98. Shaine and Fontaine-Rainen misled Plaintiff Parents on February 17, 2021, and for days, weeks, and months thereafter, about their knowledge of and deep involvement in Older Child's departure.

99. For a sustained period of time, Shaine and Fontaine-Rainen pretended to Plaintiff Parents that they did not know where Older Child was, and that they had no idea what occurred, or how, when they in fact had planned the entire departure scenario and Shaine was harboring

Older Child.

100. Plaintiff Parents were consumed with worry about Older Child, especially given Older Child's chronic medical conditions and poor state of health at the time.

101. Plaintiff Parents were emotionally and physically devastated by the Older Child's departure.

102. Plaintiff Parents did not hear directly from Older Child after her departure.

103. Throughout this time, Shaine and Fontaine-Rainen attempted to keep Older Child's whereabouts secret, and upon information and belief, instructed Older Child and J. Doe to do the same.

104. Shaine positioned himself as a gatekeeper to Older Child, providing limited information and other subsequent vague and misleading updates on Older Child's status.

105. Shaine's conduct as gatekeeper to Older Child information and communication was distressing and disturbing to Plaintiff Parents.

106. As 2021 progressed, Plaintiff Parents were shocked as they began to uncover more information revealing that not only had Shaine purchased the plane ticket for Older Child, but Shaine actually was a motivating force behind Older Child running away – a fact that was incomprehensible to them.

107. Plaintiff Parents also were astonished to learn that during 2020 Shaine and Fontaine-Rainen also had taken up intense online relationships with their younger child, Plaintiff J. Doe, who had become emotionally unwell and physically ill.

108. Shaine's and Fontaine-Rainen's relationships with J. Doe began in 2020, when J. Doe was thirteen (13) years old; J. Doe turned fourteen (14) in March 2021.

109. In or around September 2019, J. Doe started GHF/GCP classes offered through GCP, and

in or around August of 2020 enrolled in several GCP courses, including a literature class
with Fontaine-Rainen.

110.    Fall 2019 term through Spring 2021, Plaintiff Parents paid for J. Doe to be enrolled in a
total of nine GHF/GCP and GCP courses.

111.    Fontaine-Rainen began tutoring J. Doe in mathematics and literature in January 2021 and
continued tutoring J. Doe through May 2021.

112.    When Fontaine-Rainen began to tutor J. Doe, Plaintiff Parents believed J. Doe's contacts
with Fontaine-Rainen consisted solely of online courses and math tutoring.

113.    At that time, Plaintiff Parents believed Fontaine-Rainen to have a supportive level of
connection to J. Doe.

114.    However, at that time, Plaintiff Parents were not aware that that Fontaine-Rainen was
talking extensively to J. Doe outside of paid time, or that Fontaine-Rainen was spending
much more time with J. Doe than she was engaged to spend for instruction.

115.    From around January 2021 through May 2021, Shaine began offering, and sometimes
sending, J. Doe gifts.

116.    Some of the gifts J. Doe accepted from Shaine included chocolate, a GCP course
enrollment in a class Shaine taught and a conference inscription to the Beyond IQ
Conference.

117.    Other gifts and offers to purchase items, such as a handmade cape, J. Doe turned down.

118.    At no point had Plaintiff Parents enrolled J. Doe in any GCP course with Shaine, and they
were not aware of, nor did they consent to, J. Doe taking a class with Shaine or attending the
Beyond IQ Conference.

119.    There was no established teacher-student relationship between Shaine and J. Doe.

120. Beginning in 2020, Shaine and Fontaine-Rainen, Older Child and J. Doe had group communications which were nearly continuous: Defendants' communication threads with Older Child and J. Doe ran on and off all day and every day from around fall 2020 until June 2021.

121. In 2020 and into 2021, in addition to group communications, Defendants Shaine and Fontaine-Rainen each maintained individual communications with J. Doe.

122. Shaine's and Fontaine-Rainen's communications with J. Doe were conducted in secret, and the extent of these communications purposefully were not made known to J. Doe's parents, Plaintiffs Sennett and Wagner.

123. Similar to Shaine's and Fontaine-Rainen's communications with Older Child, Defendants' communications with J. Doe took place over various forms and forums: emails, Zoom meetings, phone calls and text messages, as well as chat and video functions on the social media platform Discord.

124. During the time from about fall 2020 to June 2021, when J. Doe was in nearly constant contact with Shaine and Fontaine-Rainen, Plaintiff Parents were not aware of their pervasive and highly personal communications.

125. Similar to Shaine's and Fontaine-Rainen's communications with Older Child, Defendants' communications with J. Doe, from 2020 and into 2021, expressed negative and false information to J. Doe about Plaintiff Parents.

126. Shaine and Fontaine-Rainen convinced J. Doe that J. Doe had repressed emotional abuse by their parents, and J. Doe needed to explore this underlying abuse.

127. Shaine also falsely attempted to convince J. Doe that they had multiple personalities, and falsely "diagnosed" J. Doe as having dissociative identity disorder (DID), among other

diagnoses and beliefs.

128.   Shaine is not a licensed psychologist and is not qualified to make such diagnoses.

129.   Shaine and Fontaine-Rainen  attempted to supplant themselves in the place of Plaintiff

Parents as trusted adults to J. Doe and attempted to entice J. Doe to leave home.

130.   Shaine and Fontaine-Rainen discussed various methods wherein they could remove J.

Doe from Plaintiff Parents' home.

131.   Shaine and Fontaine-Rainen considered but ultimately ruled out kidnapping J. Doe, but

continued to actively plan and plot about how to remove J. Doe from Plaintiff Parents'

home.

132.   Defendants Shaine and Fontaine-Rainen encouraged J. Doe to believe false information

about Plaintiff Parents, and Shaine's and Fontaine-Rainen's ongoing secret communications

amounted to indoctrinating J. Doe to believe a false and twisted narrative that Plaintiff

Parents were abusive and harmful.

133.   Plaintiff Parents did not know that Defendants were undermining them to Older Child and

J. Doe, nor did they know how defendants were manipulating Older Child and J. Doe.

134.   Shaine and Fontaine-Rainen never told Plaintiff Parents they were conducting extensive

and nearly constant online communications and intense emotional relationships with their

children.

135.   Throughout the fall of 2020 and winter of 2021, Plaintiff Parents saw increasing

deterioration in J. Doe's mental and physical health, despite the significant interventions

Plaintiff Parents were taking to help restore J. Doe's health.

136.   Shaine's and Fontaine-Rainen's ongoing communications falsely convinced J. Doe that

they were J. Doe's "family," instead of Plaintiff Parents.

137.   Discord Chat forums from 2020 and 2021 establish the near-constant level of
communication between Shaine and J. Doe, Fontaine-Rainen and J. Doe and both
Defendants adults with Older Child and J. Doe, all together in group chats and individually.

138.   The exclusive direct message thread on the Discord platform between Shaine and J. Doe
is voluminous and extends to at all hours of the day and night, regardless of the time
difference between the United States and France.

139.   The Discord direct message chats are in addition to the amount of time spent together
during Zoom calls initiated by Shaine sending a link to the call through the Discord
platform, which allowed the two to transition to live, virtual interactions.

140.   Shaine's Discord direct messages to J. Doe include expressions of love and overtures of
affections such as virtual hugs and kisses.

141.   Shaine referred to J. Doe as "child o' mine" at some points during this time.

142.   In late 2020 and early 2021, Shaine and Fontaine-Rainen communicated frequently with
J. Doe about their plans to get Older Child to leave the family home and their plan to do the
same for J. Doe as soon as possible.

143.   Additionally, during the timeframe of fall 2020 to spring 2021 Shaine regularly
communicated with J. Doe about suicidal ideation.

144.   Shaine withheld sharing with Plaintiff Parents the full extent he was aware of J. Doe's
suicidal ideation.

145.   During the same timeframe, Shaine regularly communicated to J. Doe about self-harm,
but did not notify Plaintiff Parents about these conversations.

146.   During this timeframe, Shaine and Fontaine-Rainen regularly communicated to J. Doe
about mental health concerns such as extreme anxiety, depression and eating disorder, but

Defendants intentionally continued to keep this information from Plaintiff Parents.

147.  During this timeframe, Defendants Shaine and Fontaine-Rainen would regularly

communicate to J. Doe about continuing to keep their communications with this young

teenager a secret and continually instructed J. Doe not to reveal the extent of their

communications to Plaintiff Parents.

148.  In February 2021, Shaine set up a secret Comcast email address, under a made-up

persona, to deceive Plaintiff Parents about continued communication between himself and J.

Doe.

149.  Shaine explained to J. Doe that he set up this persona and email so that he could continue

to be in communication with J. Doe in the event Plaintiff Parents discovered the extent of

his manipulation and cut off J. Doe's ability to communicate with him.

150.  J. Doe made audio recordings of private discussions with Plaintiff Parents, which

included family therapy sessions held on February 6, 2021, and February 19, 2021.

151.  In February 2021, Shaine and Fontaine-Rainen discussed J. Doe recording family therapy

sessions and other communications involving J. Doe with Plaintiff Parents and sending these

recordings to Shaine and Fontaine-Rainen

152.  Both Shaine and Fontaine-Rainen acknowledged receiving these recorded private,

confidential therapy sessions.

153.  The use of these private recordings by Shaine and Fontaine-Rainen was not done with

Plaintiff Parents' knowledge or permission.

154.  Both Shaine and Fontaine-Rainen used these recordings by listening to them and

continuing their indoctrination of negative and false information about Plaintiff Parents to J.

Doe.

155. Using these secret recordings, Shaine and Fontaine-Rainen would strategize and direct J. Doe on communication with Plaintiff Parents.

156. Shaine's ongoing communication with J. Doe included discussing sexuality.

157. The direct message Discord channel exclusive to Shaine and J. Doe was active until about June 15, 2021, when J. Doe learned that Shaine had repeatedly attempted to touch Older Child in inappropriate and sexual manner at his Townsend, Massachusetts home.

158. Upon learning of Shaine's unwanted and inappropriate touching of Older Child, J. Doe confronted Shaine in a Discord conversation.

159. During this Discord conversation, Shaine admitted to inappropriately touching Older Child and that he should not have done that.

160. Upon learning of Shaine's inappropriate touching of Older Child, J. Doe stopped communicating with Shaine, but not Fontaine-Rainen.

161. Fontaine-Rainen's Discord direct messages to J. Doe include expressions of love and overtures of affections such as virtual hugs and kisses.

162. Fontaine-Rainen referred to J. Doe as "kitten."

163. Fontaine-Rainen's communications with J. Doe encouraged her to explore her sexuality.

164. Fontaine-Rainen would also strategize with J. Doe on how to hide information about their online relationship from Plaintiff Parents.

165. Defendants Shaine's and Fontaine-Rainen's surreptitious communications and tortious conduct with Older Child and J. Doe represent a violation of the standards of the profession to which teachers are expected to adhere.

166. There is no legally recognized privilege in teacher-student communications.

167. In fact, professional standards advise teachers to notify parents about student concerns,

especially concerns about physical safety and mental health.[10]

## COUNT I

### Intentional Interference with Parent-Child Relationship

### Restatement (Second) of Torts § 700
### (Defendants Shaine and Fontaine-Rainen as to Plaintiffs Sennett and Wagner)

168.   The Plaintiffs reallege paragraphs 1 through 167 in their entirety.

169.   Shaine and Fontaine-Rainen actively planned and plotted over a period of many months

to develop and execute a plan removing Older Child from the family home of Plaintiff

Parents.

170.   Defendants planned the removal of Older Child from possibly as early as spring 2020

while Older Child was still seventeen, to the time of Older Child's departure in February

2021, just two months after Older Child turned eighteen.

171.   To effectuate this plan, Shaine and Fontaine-Rainen exploited Older Child's vulnerability

and groomed and indoctrinated Older Child to believe negative or false information about

Plaintiff Parents and insert themselves as trusted adults to Older Child.

172.   This grooming by Shaine and Fontaine-Rainen included insisting only they were looking

after Older Child's best interests and encouraging Older Child to reject Plaintiff Parents.

173.   Shaine's and Fontaine-Rainen's communications induced and effectively enticed Older

Child to leave Plaintiff Parents and their family home.

174.   Shaine and Fontaine-Rainen planned the logistics of Older Child's departure.

175.   Shaine purchased the airfare for Older Child to leave France, the country where Plaintiff

---

[10]    https://www.nbpts.org/certification/five-core-propostions/   See the National Board for
Teaching Standards' Five Core Propositions for teaching. "The Five Core Propositions —
comparable to medicine's Hippocratic Oath — set forth the profession's vision for accomplished
teaching."

Parents resided with Older Child.

176.  Shaine and Fontaine-Rainen made plans for how Older Child would actually leave

Plaintiff Parents home and purposefully kept secret these plans.

177.  In the devasting wake of Older Child's departure from the family home, Shaine and

Fontaine-Rainen misled Plaintiff Parents about the extent of their knowledge of Older

Child's whereabouts and their participation in removing Older Child from the family home.

178.  Beginning in February 2021 and for several months thereafter, Shaine harbored Older

Child in his home in Townsend, Massachusetts.

179.  Although Older Child had only recently turned eighteen years old at the time Older Child

left the family home, Older Child was not financially independent.

180.  Older Child had no source of income and had been dependent on Plaintiff Parents for

housing, food and basic provisions.

181.  Additionally, at that time, Plaintiff Parents were Older Child's conduit to health care,

primary caregivers, and supplied all Older Child's material needs.

182.  Up to the point of Older Child's departure, Plaintiff Parents had legal custody of Older

Child and did not consent to Older Child leaving their jurisdiction.

183.  Shaine and Fontaine-Rainen understood Plaintiff Parents did not consent to Older Child's

departure which is why they hid their roles in the departure and lied to Plaintiff Parents

about the extent of their knowledge.

184.  Up to the filing of this Complaint, the Older Child has continued to be out of

communication with and is estranged from Plaintiff Parents and J. Doe.

185.  Because of the Defendants' intentional interference with their parent-child relationship

with Older Child, Plaintiff Parents have been damaged and have suffered extreme emotional

distress and anguish.

## COUNT II

### Intentional Interference with Parent-Child Relationship

### Restatement (Second) of Torts § 700

### (Defendants Shaine and Fontaine-Rainen as to Plaintiffs Sennett and Wagner)

186.   The Plaintiffs reallege paragraphs 1 through 185 in their entirety.

187.   Shaine and Fontaine-Rainen actively planned and plotted over a period of many months

to develop and execute a plan to try to remove J. Doe from the family home of Plaintiff

Parents.

188.   Defendants began developing plans to remove J. Doe from Plaintiff Parents from at least

fall of 2020, while J. Doe was thirteen, up to June 2021, while J. Doe was fourteen.

189.   To effectuate this plan, Shaine and Fontaine-Rainen exploited J. Doe's vulnerability and

groomed and indoctrinated J. Doe to believe negative or false information about Plaintiff

Parents and insert themselves as trusted adults to J. Doe.

190.   This grooming by Shaine and Fontaine-Rainen included insisting only they, Shaine and

Fontaine-Rainen, were looking after J. Doe's best interests.

191.   Shaine and Fontaine-Rainen attempted to develop plans for J. Doe to leave Plaintiff

Parents and purposefully kept secret these plans.

192.   Shaine and Fontaine-Rainen did not reveal their communication about these plans to

Plaintiff Parents.

193.   During the period of Shaine's and Fontaine-Rainen's planning for J. Doe to leave

Plaintiff Parents' home, Plaintiff Parents had legal custody of J. Doe and did not consent to

J. Doe leaving their jurisdiction.

194.   Defendants understood Plaintiff Parents would not consent to J. Doe's departure which is

why they misled Plaintiff Parents about the extent of their planning with J. Doe.

195.   Defendants' ongoing communications with J. Doe attempted to entice J. Doe to leave

Plaintiff Parents and their family home.

196.   The plans Shaine and Fontaine-Rainen formulated regarding J. Doe also took into

consideration when J. Doe would be closer to turning eighteen years old.

197.   This grooming and indoctrination of J. Doe was a major factor in the need for J. Doe to

be placed in a residential mental health treatment facility for over a year, beginning in June

2021.

198.   Thus, the result of the Defendants' intentional interference with J. Doe resulted in J.

Doe's being absent from Plaintiff Parents' home for over a year, beginning in June 2021.

199.   Because of the Defendants' intentional interference with their parent-child relationship

with J. Doe, Plaintiff Parents have been damaged and have suffered extreme emotional

distress and anguish.

## COUNT III

### Invasion of Privacy

### M.G.L. c. 214§ 1B

### (Defendants Shaine and Fontaine-Rainen as to all Plaintiffs)

200.   The Plaintiffs reallege paragraphs 1 through 199 in their entirety.

201.   Shaine and Fontaine-Rainen interfered with Plaintiffs' privacy by their surreptitious and

near constant communication with Older Child and J. Doe.

202.   Shaine's and Fontaine-Rainen's interference with Plaintiffs' privacy resulted in false and

harmful indoctrination of Older Child and J. Doe to believe, among other untruths, that they

were abused by Plaintiff Parents.

203.   Shaine and Fontaine-Rainen interfered with Plaintiffs' privacy by attempting to insert

themselves into the Plaintiffs' family and secretly establish themselves as trusted adults to
Older Child and J. Doe.

204.    The interference was unreasonable, substantial, and serious.

205.    In addition to the secret, constant and harmful communication with Older Child and J.
Doe, Shaine and Fontaine-Rainen also interfered with Plaintiffs' privacy by listening to
recorded, private therapy sessions, as well as other private family discussions, to which
there should be no public access or distribution.

206.    The Plaintiffs have suffered damages because of this interference and invasion of
privacy.

207.    Shaine's and Fontaine-Rainen's actions destroyed Plaintiffs' family relationships and
thus Plaintiffs have suffered damage.

208.    Plaintiff Parents and Plaintiff J. Doe have struggled to repair this injury to their family
and such injury has required substantial time, resources, and therapy to repair.

209.    Plaintiffs have suffered severe physical and emotional distress as a result of this
interference.

210.    Plaintiffs continue to suffer and are agonized that the relationship with Older Child
remains broken and that Older Child remains estranged.

## COUNT IV
### Intrusion on Plaintiffs' Private Affairs or Seclusion
### (Defendants Shaine and Fontaine-Rainen as to all Plaintiffs)

211.    The Plaintiffs reallege paragraphs 1 through 210 in their entirety.

212.    Shaine and Fontaine-Rainen intentionally intruded upon the solitude and seclusion of
Plaintiffs' private family affairs with their surreptitious and near constant communication
with Older Child and J. Doe.

213.    Shaine's and Fontaine-Rainen's intentional intrusion upon the solitude and seclusion of Plaintiffs' private family affairs resulted in the false and harmful indoctrination of Older Child and J. Doe that, among other things, they were abused by Plaintiff Parents.

214.    Shaine and Fontaine-Rainen intentionally intruded upon the solitude and seclusion of Plaintiffs' private family affairs where Shaine and Fontaine-Rainen attempted to insert themselves into the Plaintiffs' family and secretly establish themselves as trusted adults to Older Child and J. Doe.

215.    Plaintiffs have the right to be free from unauthorized interference with their private family affairs.

216.    Defendants' intentional intrusion upon the solitude and seclusion of the Plaintiffs' family's private affairs was unreasonable and offensive.

217.    In addition to the secret and constant harmful communication with Older Child and J. Doe, Shaine and Fontaine-Rainen also interfered with Plaintiffs' privacy by listening to recorded, private therapy sessions, as well as other private family discussions, to which there should be no public access or distribution.

218.    The Plaintiffs have suffered damages as a result of this intrusion of their family privacy.

219.    Shaine's and Fontaine-Rainen's actions destroyed Plaintiffs' family relationships and thus Plaintiffs have suffered damage.

220.    Plaintiff Parents and Plaintiff J. Doe have struggled to repair this injury to their family and such injury has required substantial time, resources, and therapy to repair.

221.    Plaintiffs have suffered severe physical and emotional distress as a result of this interference.

222.    Plaintiffs continue to suffer and are agonized that the relationship with Older Child

remains broken and that Older Child remains estranged.

## COUNT V

### Loss of Consortium

### M.G.L.c. 231 § 85X

### (Defendants Shaine and Fontaine-Rainen as to all Plaintiffs)

223.    The Plaintiffs reallege paragraphs 1 through 222 in their entirety.

224.    Plaintiff Parents have suffered from the loss of society and companionship of Older Child

starting in at least spring of 2020, when Shaine's and Fontaine-Rainen's invasion of the

family's privacy and intrusion of the family's private affairs resulted in Older Child

withdrawing from Plaintiff Parents' company and society and growing increasingly hostile

towards Plaintiff Parents while still living in the family home.

225.    Additionally, Plaintiff Parents have suffered from the loss of society and companionship

of Older Child since Older Child physically left the family home in February 2021, as a

result of Shaine's and Fontaine-Rainen's intentional interference with parent-child

relationship.

226.    Plaintiff J. Doe suffered from the loss of society and companionship of Older Child since

they left the family home in February 2021, as a result of Shaine's and Fontaine-Rainen's

invasion of the family's privacy and intrusion in the family's private affairs.

227.    This loss of society and companionship of Older Child has damaged Plaintiff Parents

and has resulted in severe physical and emotional distress, profound grief and loss, and

ongoing turmoil.

228.    This loss of society and companionship of Older Child has damaged Plaintiff J. Doe and

has resulted in severe physical and emotional distress, profound grief and loss, and ongoing

turmoil.

229.    Additionally, Plaintiff Parents have suffered from the loss of society and companionship

of J. Doe starting in at least September 2020, when Shaine's and Fontaine-Rainen's

interference of parent-child relationship, invasion of the family's privacy and intrusion of

the family's private affairs resulted in J. Doe withdrawing from Plaintiff Parents' company

and society, while still living in the family home as well as J. Doe's prolonged absence from

the home in order to receive intensive mental health treatment.

230.    Plaintiffs continue to suffer and are agonized that the relationship with Older Child

remains broken and Older Child remains completely estranged from Plaintiff Parents.

## COUNT VI
### Violation of Wiretap statute, aka Eavesdropping
### M.G.L. c. 272 § 99(q)
### (Defendants Shaine and Fontaine-Rainen as to all Plaintiffs)

231.    The Plaintiffs reallege paragraphs 1 through 230 in their entirety.

232.    Shaine and/or Fontaine-Rainen encouraged Older Child and J. Doe regarding secretly

recording Plaintiff Parents' private family therapy sessions and other private family

conversations.

233.    These secret recordings, including recordings of family therapy on February 6 and 19,

2021, as well as other private family discussions, were transmitted to Shaine and Fontaine-

Rainen via email and Discord.

234.    Shaine and Fontaine-Rainen received, acknowledged, and discussed the recordings with

Older Child and J. Doe, and used these recorded sessions to further their ongoing tortious

conduct against Plaintiff Parents.

235.    Shaine and Fontaine-Rainen used these recordings in furtherance of their goals of

indoctrinating Older Child and J. Doe and enticing them away from Plaintiff Parents' family

home.

236.  Plaintiff Parents' privacy rights were violated by Shaine and Fontaine-Rainen use of

these private family discussions.

237.  Plaintiff Parents are aggrieved and have suffered substantial damages.

## COUNT VII

### Intentional Infliction of Emotional Distress

### (Defendants Shaine and Fontaine-Rainen as to all Plaintiffs)

238.  The Plaintiffs reallege paragraphs 1 through 237 in their entirety.

239.  Shaine and Fontaine-Rainen intended, knew, or should have known their conduct in

conducting continuous, surreptitious, negative and false communication with Older Child

and J. Doe would result in destroying the family relationships with the Plaintiff Parents and

consequently Plaintiffs' extreme emotional distress.

240.  Shaine and Fontaine-Rainen were well aware of Plaintiff Parents' distress after Older

Child left the home, and even with that knowledge, compounded Plaintiff Parents' distress

by intentionally continuing to mislead Plaintiff Parents about Older Child's whereabouts

and their roles in encouraging, planning and facilitating Older Child to leave, and harboring

Older Child.

241.  Shaine and Fontaine-Rainen intended, knew, or should have known that their conduct in

directing continuous, surreptitious, negative and false communication with J. Doe would

result in destroying J. Doe's relationship with Plaintiff Parents and thereby causing further

extreme emotional distress for all Plaintiffs.

242.  Shaine's and Fontaine-Rainen's conduct was extreme and outrageous, beyond all bounds

of decency and was utterly intolerable in a civilized community.

243.  Shaine's and Fontaine-Rainen's actions are the direct and proximate cause of Plaintiff J.

Doe's distress.

244. Shaine's and Fontaine-Rainen's actions are the direct and proximate cause of Plaintiff

Parents' distress.

245. The emotional distress sustained by J. Doe was severe and no reasonable person could be

expected to endure it.

246. The emotional distress sustained by Plaintiff Parents was severe and no reasonable person

could be expected to endure it.

## COUNT VIII

### Negligent Infliction of Emotional Distress

### (Defendants Shaine and Fontaine-Rainen as to all Plaintiffs)

247. The Plaintiffs reallege paragraphs 1 through 246 in their entirety.

248. Shaine and Fontaine acted negligently, carelessly and with indifference in conducting

continuous, surreptitious, negative, and false communication with Older Child and J. Doe

such that it would result in Plaintiff Parents' and J. Doe's emotional distress.

249. As a result of Shaine's and Fontaine-Rainen's conduct, Plaintiffs suffered emotional

distress and pain and suffering.

250. Plaintiff Parents' emotional distress is evidenced by objective symptomology including

significant weight loss, hair loss, mild aphasia, and hypertension.

251. As a result of Shaine's and Fontaine-Rainen's actions Plaintiff Parents have also

experienced intense depression, anxiety and emotional distress.

252. Plaintiff J. Doe's emotional distress is evidenced by objective symptomology including

weight loss, fatigue and requiring on-going treatment for mental health concerns.

253. As a result of Shaine's and Fontaine-Rainen's actions, Plaintiff J. Doe has experienced

intense depression, anxiety and emotional distress.

254.   As a direct and proximate result of the Defendants' actions, Plaintiff Parents have been

damaged.

255.   As a direct and proximate result of the Defendants' actions, Plaintiff J. Doe has been

damaged.

## COUNT IX

### Breach of Contract

### (All Defendants as to Plaintiff Parents)

256.   The Plaintiffs reallege paragraphs 1 through 255 in their entirety.

257.   GCP offered and marketed courses targeted for "teens and adults" and for "young

people".

258.   Additionally, moving GHF courses to the GCP platform enabled the sales of online

courses, kept students who were enrolled already with GHF on a continuing course with

GCP and thus GCP maintained GHF's goodwill and brought awareness among GHF's

clientele to GCP.

259.   GCP represented continuity from GHF, offering many of the same or similar courses and

several of the same teachers.

260.   In reliance on those representations and GCP's own detailed representations, which

appeared to be that their courses were substantive, thought-provoking material and that GCP

had a stable of experienced, professional teachers, Plaintiff Parents accepted Defendant's

offers for courses and paid good and valuable consideration in the form of course fees and

in some cases, supplemental materials such as books.

261.   Plaintiff Parents purchased courses for their children, in subjects which included but

were not limited to, math, philosophy, psychology, history, social science, science and

literature.

262.    GCP materially misrepresented that the teachers in its employ were professionals and as
such, created the reasonable belief for their customers that their teachers would behave like
professionals, and Plaintiff Parents relied on that representation.

263.    Shaine and Fontaine-Rainen materially misrepresented themselves as teachers or teaching
professionals such that Plaintiff Parents had no reason to imagine that they would behave
otherwise.

264.    Defendants Shaine and Fontaine-Rainen, both as agents of GCP, and in their own right,
did not behave according to standards of professionalism for teaching, by among other
things:

    a.  engaging in highly inappropriate, intimate, personal relationships with Older Child
and J. Doe;

    b.  not reporting to or sharing with Plaintiff Parents that they were talking to their
children about personal issues and/or difficulties including but not limited to suicidal
ideation;

    c.  offering and sending Older Child and J. Doe gifts;

    d.  advising and instructing both Older Child and J. Doe to keep secret from Plaintiff
Parents the fact that they were engaging in round the clock conversations with
Shaine and Fontaine-Rainen;

    e.  using their positions of trust with vulnerable teens, Plaintiff J. Doe and Older Child,
to manipulate them;

    f.  advising and instructing Older Child and J. Doe as to how to hide their relationships
with Shaine and Fontaine-Rainen;

    g.  attempting to entice J. Doe and enticing Older Child to run away from home and

facilitating the same, including but not limited to, by devising the plan and actual

logistics, and buying plane tickets;

h. Defendant Shaine luring Older Child to his home to live with him and attempting to

molest Older Child.

265.   GCP, Shaine, and Fontaine-Rainen materially breached their contracts with Plaintiff

Parents by offering courses and experienced professional teachers and accepted payment for

the same, but then engaged in conduct which resulted in devastation and catastrophe for the

Plaintiff Parents and J. Doe.

266.   GCP materially breached its contract in which it misrepresented itself as providing

experienced professional teachers who knew how to behave with their students, and caused

the reasonable belief that Plaintiff Parents could rely on its expertise and professionalism

and accepted payment for teaching.

267.   As a result of the Defendants' breach of contract, Plaintiffs now seek relief in the form of

damages and seek to recover all monies spent as a result of breach.

268.   Plaintiffs seek damages as a result of money spent on classes where Defendants in fact

breached their contracts, as well as monies spent on mental and physical rehabilitation

necessary as a result of broken contracts.

## Count X
### Breach of the Duty of Good Faith and Fair Dealing, and
### Breach of the Implied Covenant of Good Faith and Fair Dealing,
### (All Defendants as to Plaintiff Parents)

269.   The Plaintiffs reallege paragraphs 1 through 268 in their entirety.

270.   Defendants knew the purpose for which their services were being contracted, i.e.,

education of minor children, and Defendants also knew that the Plaintiffs would have a

reasonable expectation that Defendants would provide such educational opportunities and behave as professionals.

271. Plaintiff Parents paid Defendants to teach courses in math, philosophy, psychology, history, social science, science and literature. .

272. Plaintiff Parents entered the transactions relying on their belief that the Defendants were acting in good faith in providing educational activity.

273. Defendants had the obligation not to destroy Plaintiffs' reasonable expectations in the fruits of their bargain and to deliver their side of the bargain.

274. Under no circumstances would Plaintiff Parents have imagined that the Defendants would engage in extra-scholastic, highly inappropriate, intimate, personal relationships and use their positions of trust with vulnerable teens to prey on and manipulate their children, Plaintiff J. Doe and Older Child, and thereby cause such profound harm to their children, to their family unit, and consequently to Plaintiff Parents.

275. Defendants' conduct was conscious and deliberate and frustrated the purpose of the contract.

276. Defendants GCP, Shaine and Fontaine-Rainen are in breach of their Duty of Good Faith and Fair Dealing, and therefore in breach of contract, due to their gross and highly inappropriate behavior with Older Child and J. Doe, which exceeded any reasonable boundaries of normal teacher-student relationships, expectations of parents, and obviously is inconsistent with the purpose of the contract.

277. Defendant GCP's website, through which Plaintiffs secured these expected teaching opportunities, described reasonable courses for education, and thus GCP is in breach of the Duty of Good Faith and Fair Dealing by not ensuring a safe educational space for minor

children.

278.    Plaintiffs also have spent significant sums as a result of the breach of this contract and

are now seeking relief.


WHEREFORE, the Plaintiffs request this Court enter judgment against all defendants.

jointly and severally on all counts of this Complaint and where appropriate:

   a. Award compensatory damages;

   b. Award punitive damages;

   c. Award interest and costs of this action to the Plaintiffs;

   d. Award attorneys' fees to the Plaintiffs; and

   e. Award such other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs demand a trial by jury on all issues so triable.

BARBARA SENNETT, HANS WAGNER,
J. DOE,
By their attorney,

Elizabeth K. Keeley
B.B.O. No. 669311
Butters Brazilian LLP
699 Boylston Street, 12th floor
Boston, Massachusetts 02116
617.367.2600
keeley@buttersbrazilian.com

Dated: 5|5|23

**EXHIBIT 2**

| DEFAULT ORDER<br>(Mass. R. Civ. P.  55(a)) | DOCKET NUMBER<br><br>2381CV01291 | Trial Court of Massachusetts<br>The Superior Court  |
|---|---|---|

| CASE NAME  Barbara Sennett et al vs. Josh Shaine, a/k/a Joseph P. Shaine et al | Michael A. Sullivan, Clerk of Court<br>Middlesex County |
|---|---|

| TO:<br><br>  File Copy | COURT NAME & ADDRESS<br><br>  Middlesex Superior - Lowell<br>  370 Jackson Street<br>  Lowell, MA 01852 |
|---|---|

The party(s), named below, having failed to plead or otherwise defend the case as required by the rules of civil procedure, and plaintiff having shown that fact by affidavit or otherwise, is(are) hereby defaulted pursuant to Mass. R. Civ. P. 55(a).

  Josh Shaine, a/k/a Joseph P. Shaine

The plaintiff shall file one of the following, if not already entered:

    1.  in accordance with Mass. R. Civ. P. 55(b)2  and subject to Mass. R. Civ. P. 54(b)  and 55(b)4, file a motion for an assessment of damages and default judgment by, 09/07/2023.

or

    2. in accordance with Mass.R.Civ.P. 55(b)(1) (for a sum certain or for a sum which can by computation be made certain) and subject to Mass.R. Civ. P. 54(b) and 55(b)4, file a request for default judgment by, 09/07/2023.

| DATE ISSUED<br><br>**08/08/2023** | CLERK OF COURTS<br><br>**Michael A. Sullivan, Clerk of Court** | ASSISTANT CLERK<br><br>**X** | SESSION PHONE# |
|---|---|---|---|

Date/Time Printed: 08-08-2023 09:06:59                                                                                                    SCV039\ 05/2014